# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

CAROL MONCAK,

      Plaintiff,

      v.

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,

      Defendant.

CIVIL ACTION NO. 3:15-cv-01998

(SAPORITO, M.J.)

## MEMORANDUM

This is an action for benefits under the Employment and Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* This matter is before the Court on the parties' cross-motions for summary judgment. (Doc. 17; Doc. 20). For the reasons that follow, we will grant the defendant's motion and deny the plaintiff's motion.

## I.  BACKGROUND

The material facts of this case are largely undisputed.

The plaintiff, Carol Moncak, worked for Cinram Manufacturing Company LLC as a DVD Mold Operator. As a full-time non-union employee of Cinram Manufacturing LLC, she was insured under a group disability income policy (the "Policy"), bearing policy number GD/GF3-830-

505658-01, issued by the defendant, Liberty Life Assurance of Boston ("Liberty"), and effective January 1, 2005. (Doc. 10-1). The Policy provides long-term disability benefits to full-time employees of Cinram (U.S.) Holdings, Inc. ("Cinram") and affiliated companies, including Cinram Manufacturing Company LLC.

Moncak ceased work on February 24, 2010, because of low back and leg pain. She received short-term disability benefits under the Policy during a 180-day elimination period[1] before becoming eligible for payment of long-term disability benefits on August 23, 2010. She then received long-term disability benefits for two years under the Policy's "own occupation" period of disability coverage. On August 7, 2012, after reviewing Moncak's medical treatment records and obtaining a peer review report from a consulting physician, Liberty issued a determination discontinuing Moncak's benefits effective August 23, 2012, on the ground that she was not disabled under the Policy's "any occupation" period of disability

---

[1] "[M]ost disability insurance includes a provision for an 'elimination period,' specifying that benefits are not payable at all unless and until the insured has been continuously disabled for the specified period. Most major employers have sick days or similar benefits that operate to keep an employee's salary steady during at least some part of the elimination period . . . ." 12 Steven Pitt et al., *Couch on Insurance* § 182:10 (3d ed. 2014).

coverage. Moncak pursued an administrative appeal of this decision, which was denied on March 6, 2013, following additional review of her medical records by a consulting nurse.

## A. The Policy

The Policy provides a general definition of "disability," which states:

> "Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and . . . thereafter, the Covered Person is unable to perform, with reasonable continuity, the Materials and Substantial Duties of Any Occupation.

(Doc. 10-1, at 12). "'Own Occupation' . . . means the Covered Person's occupation that he was performing when his Disability . . . began." (*Id.* at 15). "'Any Occupation' means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." (*Id.* at 11). "'Material and Substantial Duties' . . . means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." (*Id.* at 14).

If the covered person is deemed "Disabled" under the Policy, Liberty is obligated to pay her a monthly benefit equal to 60% of her monthly

earnings from Cinram, less any other earnings or benefits, such as workers compensation or Social Security disability benefits. (*Id.* at 9).

The Policy also provides that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (Doc. 10-2, at 24).

### B. The Plaintiff's Disability Claim

Moncak ceased working on February 24, 2010, due to low back and leg pain. Over the course of the preceding three months, she had presented to her treating orthopedic surgeon, Alan P. Gillick, M.D., complaining of increasing and "relentless" back and leg pain, which had been causing her to miss work intermittently. (Doc. 10-9, at 27; Doc. 10-12, at 11). Moncak reported "pain radiating down the right leg into the toes and aching in both legs." (Doc. 10-9, at 27). Upon physical exam, flexion and extension caused increased pain, and her straight leg raising was positive for increased back pain. (Doc. 10-9, at 27; Doc. 10-12, at 11). Based on medical imaging and a physical examination, Dr. Gillick found "endstage narrowing of the L5-S1 disk space" and "advanced disk degeneration L5-S1

with a central protrusion," and that Moncak "would probably be a candidate for an L5-S1 fusion." (Doc. 10-9, at 27; Doc. 10-12, at 11).

On April 20, 2010, Moncak underwent surgery, performed by Dr. Gillick. (Doc. 10-12, at 13–14). Dr. Gillick performed an anterior discectomy and interbody fusion, L5-S1, using anterior interbody cage and bone morphogenetic protein, and a bilateral L5 root decompression, instrumented L5-S1 fusion using bone morphogenetic protein and right posterior iliac crest graft. (*Id.*). She was discharged from the hospital three days later, on April 23, 2010. (Doc. 10-14, at 27–28). She presented for a follow-up appointment with Dr. Gillick on June 9, 2010. (Doc. 10-12, at 15). Dr. Gillick noted that she was "symptomatically doing relatively well" six weeks out from surgery. (*Id.*).

On June 24, 2010, Liberty advised Moncak by letter that she had been determined eligible to receive long-term disability benefits under the Policy's "Own Occupation" period of disability, effective upon expiration of the Elimination Period on August 23, 2010. (Doc. 10-14, at 31–33).

On July 19, 2010, Moncak presented to Dr. Gillick for a follow-up appointment. (Doc. 10-12, at 16). Dr. Gillick noted that Moncak "is three months out and seems to be doing extremely well." (*Id.*).

> Her exam shows well healed incision, no tenderness. No swelling, no pain with gentle movements, flexion, extension with restrictions of the brace. Straight leg raising is negative. Motor and sensation are normal. Reflexes are +1 and symmetrical. Good pulses. No skin changes.

(*Id.*).

On September 22, 2010, Moncak presented to Dr. Gillick for a follow-up appointment. (Doc. 10-12, at 17). Dr. Gillick noted that, five months out from surgery, she was "doing well." (*Id.*). Moncak reported "somewhat of an achy discomfort in her back," and continued Vicodin use because without it, "her pain will start to escalate." (*Id.*).

> Her physical exam shows a healed incision, anteriorly and posteriorly. There is no tenderness. There is no pain with gentle flexion and extension type movements within the restrictions of the brace. Her straight leg raising is negative. Motor and sensation of the lowers are normal. Reflexes are +1 and symmetric. Good pulses. No skin changes.

(*Id.*). Dr. Gillick advised her to start weaning herself out of the back brace she had been wearing since the surgery, maintaining a "cautiously increasing activity level." (*Id.*).

On December 1, 2010, Moncak presented to Dr. Gillick for a follow-up appointment. (Doc. 10-12, at 18). Dr. Gillick noted that, seven months out from surgery, she was "doing relatively well." (*Id.*). Moncak reported that

she still had "a fair amount of discomfort in her back. Some days she is good and some days she feels that she is still pretty limited." (*Id.*).

> Her physical exam shows a well healed incision. There is no swelling, redness, minimal tenderness. There is some discomfort with flexion and extension movements. Her straight leg raising is negative. Motor and sensation of the lowers are normal. Reflexes are +2 and symmetric. Good pulses. No skin changes. She again no longer gets the pain radiation to her legs.

(*Id.*). Dr. Gillick started her on physical therapy. (*Id.*). Over the course of the next six months, Moncak participated in a physical therapy program, initially meeting with a therapist several days a week.

On February 7, 2011, Moncak presented to Dr. Gillick for a follow-up appointment. (Doc. 10-12, at 19). Dr. Gillick noted that "[s]ymptomatically she seems to be doing well. She said she is a bit improved even a little more from the last visit." (*Id.*).

> Her physical exam shows a healed incision. There is minimal tenderness, minimal discomfort with flexion and extension and rotational movements. Her straight leg raising in negative. Motor and sensation of the lowers are normal. Reflexes are +1 and symmetric. Good pulses. No skin changes.
>
> X-rays show intact instrumentation, good alignment and good healing. She will finish up the physical therapy/ home exercise program.

(*Id.*). Dr. Gillick advised her to return for a follow-up appointment in two

or three months, "hoping at that point that she can consider some type of modified return to work." (*Id.*).

On April 18, 2011, Moncak presented to Dr. Gillick for a follow-up appointment. (Doc. 10-12, at 20). Dr. Gillick noted that, one year after her surgery, she was "symptomatically doing reasonably well," though "she still has some aching discomfort in her back and a fairly constant aching in her legs. The aching in her back is actually worse when she walks, but if she walks with a cart . . . she has no pain at all." (*Id.*).

> Her physical exam shows healed incisions, anterior and posterior. There is some posterior midline tenderness. There is some discomfort with flexion and extension movements of the lumbar spine. Her straight leg raising is negative. Motor and sensation of the lowers are normal. Reflexes are +1 and symmetric. Good pulses. No skin changes.
>
> X-rays show intact instrumentation, good alignment and good healing.

(*Id.*). Dr. Gillick advised Moncak to continue to "cautiously increase her activity level" and return for a follow-up in six months. (*Id.*).

On June 1, 2011, Dr. Gillick completed a Liberty Mutual Restrictions Form, stating that she was recovering from spine surgery, she should cautiously increase her activity level, she was taking Norco for pain, and she was not capable of working. (Doc. 10-12, at 3).

On July 7, 2011, Moncak presented to her treating family physician, Thomas G. Majernick, D.O., with complaints of constant leg pain despite her pain medication. (Doc. 10-11, at 36–38). Dr. Majernick noted that Moncak walked with "a labored gait." (*Id.*). He ordered an MRI of the lumbar spine and an arterial duplex lower extremity bilateral. (*Id.*).

On July 12, 2011, Moncak underwent the prescribed medical imaging procedures. (Doc. 10-7, at 23–26; Doc. 10-11, at 46). According to the radiologist's report, the MRI revealed:

> There are prominent focal concavities at L1 and L2 superior endplates suggesting chronic focal intervertebral herniations. . . . At L5/S1, there is facet and ligamentum flavum hypertrophy but no definite canal or foraminal stenosis. . . . Comparison with prior study shows stable superior endplate deformities at L1 and L2 and interval lower lumbar surgical changes.

(Doc. 10-11, at 46). The radiologist concluded: "Changes of interbody and posterior fusion at L5-S1. Mile levoscoliosis. No [herniated disc] or significant stenosis. Shallow spondylosis and bulging as above. Stable chronic superior endplate deformities at L1 and L2." (*Id.*). A different radiologist read the arterial ultrasound, which revealed:

> Bilateral resting [ankle/brachial indexes] suggest mild disease on the right side measuring 0.93 and moderate disease on the left side measuring 0.88.

The right lower extremity shows mild atherosclerotic wall changes. An increase in velocities in the right common femoral artery and proximal superficial femoral artery suggests a 50-75% stenosis and a 30-49% stenosis in the mid superficial femoral artery.

The left lower extremity shows mild atherosclerotic wall changes. An increase in velocities in the left common femoral artery suggests a 50-75% stenosis and a 30-49% stenosis in the proximal superficial femoral artery.

(Doc. 10-7, at 23–26).

On August 8, 2011, Moncak presented to Dr. Majernick for a follow-up appointment with respect to her leg and back pain. (Doc. 10-11, at 39–41). Dr. Majernick observed that Moncak walked with "a normal gait for age." (*Id.*). Dr. Majernick referred her to a vascular specialist to assess her for peripheral vascular disease. (*Id.*).

On August 15, 2011, Dr. Majernick completed a Liberty Mutual Restrictions Form, stating that she was "unable to work in any capacity due to continued back & leg pain" and that she "cannot work due to pain & medications taken for same." (Doc. 10-11, at 35).

On September 27, 2011, Moncak presented to a vascular surgeon, Ed Batzel, M.D., for assessment of her peripheral arterial disease. (Doc. 10-7, at 21–22). Dr. Batzel noted that she had complaints of "pain in her bilateral calves, more so on the left than the right, consistent with

vascular claudication," which occurs after walking "a couple of blocks and is somewhat disabling." (*Id.*). Based on Moncak's subjective symptoms, her medical imaging, and physical examination, Dr. Batzel concluded that:

> The patient has a leg pain that I think is multifactorial. I think the pain that she is getting at rest and when she is standing is probably due to the lower back or perhaps some other musculoskeletal problem, but certainly not vascular. However, when she walks, the pain she gets in her calf, I think, is vascular claudication. . . . Since it is mildly disabling, I would make a soft recommendation for angiography and possible angioplasty or vascular reconstruction. . . . [T]his is at the present time not a limb-threatening problem . . . .

(*Id.*). In the event she did not wish to proceed with angiography and possible angioplasty, Dr. Batzel advised Moncak to return for a follow-up in six months with repeat ultrasound studies. (*Id.*).

On October 19, 2011, Moncak presented to Dr. Gillick for a follow-up appointment, eighteen months after surgery. (Doc. 10-4, at 44). Dr. Gillick noted that "[s]ymptomatically she is experiencing discomfort. . . . It is localized to the right of the midline." (*Id.*).

> Physical examination really does not show tenderness over the iliac crest graft site. She has a healed midline incision. There is no local tenderness. She does get discomfort with flexion and extension and rotational movements. Her straight leg raising is negative. Motor and sensation of the lowers are normal. Reflexes are +1 and symmetric. Good pulses. No skin changes.

> X-rays show intact instrumentation, good healing and well positioned interbody cage, also with healing.
>
> The etiology of the pain is unclear. She still takes a fair amount of Vicodin, although she said it is not as effective as it had been in the past. I suggested maybe adding some anti-inflammatory and I will see her in six months again.

(*Id.*).

On November 14, 2011, Moncak presented to Dr. Majernick for assessment or treatment of diabetes, high cholesterol, and high blood pressure. (Doc. 10-7, at 13–15). Dr. Majernick observed that Moncak walked with "a normal gait for age," motor strength in her lower extremities was intact, and her reflexes were symmetric and 3+ bilaterally. (*Id.*). That same day, Dr. Majernick completed a Liberty Mutual Restrictions Form, stating that Moncak was "unable to work in any capacity due to continued back & leg pain" and that she "cannot work due to pain & medications taken for same—takes Norco [as needed for] pain." (*Id.*).

On February 14, 2012, Moncak presented to Dr. Majernick for treatment of high blood pressure, high cholesterol, and diabetes, and with complaints of bilateral back and leg pain. (Doc. 10-6, at 22–24). Moncak reported bilateral low back pain and "tooth ache" pain on the back of both

legs. (*Id.*). Dr. Majernick observed that Moncak walked with "a slightly atalgic gait for age," her motor strength in her lower extremities was intact, and her reflexes were symmetric and 3+ bilaterally. (*Id.*).

On February 20, 2012, Moncak presented to Dr. Majernick with disability papers to be filled out, and with complaints of "[c]ontinued low back pain [that] radiates like tooth ache down [the] back [of] both legs to knees." (*Id.* at 18–20). Dr. Majernick observed that Moncak walked with "a normal gait for age," her motor strength in lower extremities was intact, and her reflexes were symmetric and 3+ bilaterally. (*Id.*). That same day, Dr. Majernick completed a Liberty Mutual Restrictions Form, stating that Moncak was "unable to work in any capacity due to back and leg pain" and that the "patient is in constant pain." (*Id.* at 27).

On May 15, 2012, Moncak presented to Dr. Majernick for follow-up on her high blood pressure, high cholesterol, and diabetes. (Doc. 10-5, at 38–40). Dr. Majernick observed that she walked with "a normal gait for age," her motor strength was intact in her lower extremities, and her reflexes were symmetric and 3+ bilaterally. (*Id.*).

On June 25, 2012, Moncak presented to Dr. Gillick for her two-year post-surgical follow-up appointment. (*Id.* at 1). Dr. Gillick noted:

> . . . She is symptomatically about the same. She said she has improved from where she was preoperatively. She still has enough pain that it is a nuisance. She is constantly looking for ways to treat the pain. She tries to stay away from any type of narcotic medication.
>
> Her physical exam shows a well healed incision. There is no swelling or redness. There is a little bit of tenderness. She has some discomfort with flexion and extension movements. Her straight leg raising is negative. Motor and sensation of the lowers are normal. Reflexes are +1 and symmetric. Good pulses. No skin changes.
>
> X-rays show intact instrumentation. She appears to have a nicely healed fusion. The etiology of the pain is unclear. Some of the symptoms are suggestive that it could be at least partially hardware related pain. We did talk about considering removing her posterior instrumentation. She is not enthusiastic about additional surgery. She will consider the option. She does not need additional X-rays. I will see her back in six months to check her progress.

(*Id.*).

On July 5, 2012, Dr. Gillick completed a Liberty Mutual Restrictions Form, stating that Moncak was unable to work due to constant back pain. (*Id.* at 2).

On July 19, 2012, consulting physician C. David Bomar, M.D., a board-certified orthopedic surgeon, prepared a report at Liberty's request, based on Dr. Bomar's review of Moncak's medical records. (Doc. 10-4, at 35–38).  Dr. Bomar noted his medical opinion:

The claimant is a 51-year-old woman who underwent an L5-S1 lumbar fusion in April 2010. The available records support restrictions of avoidance of lifting more than about 20 pounds. The records do not support inability to work full time with these restrictions. The claimant's attending physician's restrictions stated the claimant had no work capacity. These restrictions are not supported by the available records.

The claimant is being seen every six months by her spine surgeon, Dr. Alan Gillick. This is appropriate follow-up for the claimant's condition. Some consideration was given to removal of posterior hardware from the claimant's spine. This would be appropriate treatment if the claimant decides to proceed with that surgery.

(*Id.* at 35–36). Dr. Bomar provided his further analysis of the plaintiff's medical documentation:

The claimant had a history of low back pain for a number of years. She was found to have degenerative disk disease of L5-S1 with a central disk protrusion. She came under the care of Dr. Gillick who performed an anterior and posterior L5-S1 fusion in April 2010. The claimant reported to Dr. Gillick over the following two years that she was better than preoperatively, but she continued to have back and leg pain. There was never any indication of a neurological deficit. Strength and sensation were reportedly normal at most office visits. Dr. Gillick's last office visit with the claimant was on 6/25/12. She had a little tenderness and some discomfort with spinal motion. X-rays showed a solid fusion. She was to return in six months.

The claimant has also been followed by her internist, Dr. Majernick. His examinations over the last two years have repeatedly shown a normal gait and no neurological

deficit. At his last report on 5/15/12, she was followed up for hypertension and diabetes. Examination of the back and the legs was similar to Dr. Gillick's findings.

In summary, the claimant had an L5-S1 fusion that was successful. The reasons for any continued severe impairment are not evident from the record. The claimant appears to be doing well with normal gait, normal strength, and normal sensation. A return to full-time work with the restrictions discussed initially would appear to be a reasonable expectation at this time.

(*Id.* at 36).

On July 19, 2012, Dr. Bomar spoke won the telephone with Dr. Majernick. (*Id.* at 32). During that conversation, Dr. Majernick noted that Moncak "continues to have low back pain requiring regular use of Vicodin," and that she "complains of inability to sit for a long time." (*Id.*). Dr. Majernick opined that he "did not think that she can work full time even at a sit down job due to her symptoms and chronic narcotic use." (*Id.*).

On July 26, 2012, Dr. Bomar prepared a brief memorandum on his attempts to contact Moncak's treating physicians. (*Id.* at 29). Dr. Bomar recounted his phone conversation with Dr. Majernick, and provided his medical opinion:

The above conversation [with Dr. Majernick] does not change the conclusions in my initial report. The claimant's physical exam findings have been modest and her fusion was successful. Long term use of a mild

> narcotic such as Vicodin should not prevent regular work
> duties. Inability to resume full time light work with
> frequent sitting, standing, or walking and occasional
> lifting up to 20 pounds is not supported by the records.
> Some further evaluation of the claimant's function may
> be considered.

(*Id.*). Dr. Bomar noted that Dr. Gillick did not respond to his telephone

messages. (*Id.*).

Finally, Liberty also relied upon a July 31, 2012, vocational skills

report prepared by Jill Brown, an independent vocational case manager

retained by Liberty. The report was based on Moncak's documented

education and work history, and Dr. Bomar's medical opinion that Moncak

should avoid lifting more than about 20 pounds. (Doc. 10-4, at 23–25). The

vocational case manager found four alternative sedentary, entry-level

occupations for which Moncak was qualified based on her physical capacity

and her training, education, and experience: Gate Guard, Information

Clerk, Telephone Solicitor, and Order Clerk. (*Id.* at 24).

Based on the foregoing medical and vocational evidence, Liberty

determined that Moncak was not disabled under the Policy's "any

occupation" period of coverage, and therefore it terminated payment of

long-term disability benefits effective August 22, 2012. (Doc. 10-4, at 19–22

(initial benefits denial letter); Doc. 10-3, at 45–50 (denial of administrative

appeal).

### C. Disputed Facts

The primary fact dispute concerns whether Liberty properly credited the medical opinion of Liberty's consulting physician, Dr. Bomar, over those of Moncak's treating physicians. In particular, Moncak contends that Liberty unreasonably rejected: (a) Dr. Gillick's opinion that Moncak is unable to work due to constant back pain; and (b) Dr. Majernick's opinion that Moncak is unable to work full time even at a sit-down job due to her symptoms and chronic narcotic use.

The plaintiff also disputes whether Liberty properly credited Brown's vocational skills report, which the plaintiff argues is facially unreasonable. In particular, the plaintiff notes that the vocational case manager never met or spoke with Moncak, and that she relied exclusively on Dr. Bomar's medical opinion.

## II.   PROCEDURAL HISTORY

Moncak initiated this action by filing a complaint in the Court of Common Pleas of Lackawanna County on September 14, 2015. (Doc. 1-2). Liberty removed the action to this Court on October 15, 2015. (Doc. 1). Liberty answered the complaint on October 22, 2015. (Doc. 3). The

administrative record was filed on December 21, 2015. (Doc. 10). The parties consented to having a United States magistrate judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, and the case was reassigned to the undersigned on January 15, 2016. (Doc. 11). The parties filed cross-motions for summary judgment on March 4, 2016. (Doc. 17; Doc. 20). These motions are fully briefed and ripe for decision.

## III. STANDARD OF REVIEW

### A. The ERISA Standard of Review

A claim challenging the termination of benefits brought under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

> Whether a plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan. There are no "magic words" determining the scope of judicial review of decisions to deny benefits, and discretionary powers may be granted expressly or implicitly. However, when a plan is ambiguous, it is construed in favor of the insured. The plan administrator bears the burden of proving that the arbitrary and

capricious standard of review applies.

*Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (internal

citations and quotation marks omitted).

In this case, there is no dispute as to the applicable standard of

review. The parties agree that the plan at issue reserves discretionary

authority to the plan administrator, Liberty.

> When a plan grants its administrator such discretionary
> authority, trust principles make a deferential standard of
> review appropriate, and we review a denial of benefits
> under an "arbitrary and capricious" standard.[2] Likewise,
> when an administrator acts pursuant to her authority to
> construe the terms of the plan, or to act as a finder of
> facts, we also apply the arbitrary and capricious standard
> when reviewing those interpretations and factual
> findings.

*Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120–21 (3d Cir. 2012) (internal

footnotes, citations, quotation marks, and alterations omitted). "An

administrator's decision is arbitrary and capricious if it is without reason,

---

[2] "In the ERISA context, the arbitrary and capricious and abuse of
discretion standards of review are essentially identical." *Miller v. Am.
Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011). Accordingly, the terms
"arbitrary and capricious" and "abuse of discretion" are often used
interchangeably in Third Circuit ERISA case law. *See, e.g.*, *Fleisher v.
Standard Ins. Co.*, 679 F.3d 116, 121 n.2 (3d Cir. 2012).

unsupported by substantial evidence,[3] or erroneous as a matter of law." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) (internal quotation marks omitted).

Finally, "[i]n determining whether an administrator abused its discretion, we must consider any structural conflict of interest as one of several factors." *Viera*, 642 F.3d at 413; *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–16 (2008); *Firestone*, 489 U.S. at 115. In this case, it is beyond dispute that such a conflict of interest exists, as Liberty "both evaluates claims for benefits and pays benefit claims." *See Glenn*, 554 U.S. at 112. The parties do appear to dispute, however, the significance or severity of the conflict in this case. *See id.* at 115.

## B. The Summary Judgment Standard

Also applicable here is the standard of review pertaining to summary judgment motions. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute

---

[3] In the ERISA context, "substantial evidence" is "defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fleischer*, 679 F.3d at 121 (internal quotation marks omitted). Moreover, "[w]hen reviewing an administrator's factual determinations, [the court may] consider only the evidence that was before the administrator when he made the decision being reviewed." *Id.* at 121 (internal quotation marks omitted).

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

"The rule is no different where there are cross-motions for summary

judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir.

2008).

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). Thus,

"when presented with cross motions for summary judgment, the Court

must consider the motions separately, and view the evidence presented for

each motion in the light most favorable to the nonmoving party." *Borrell v.*

*Bloomsburg Univ.*, 63 F. Supp. 3d. 418, 433 (M.D. Pa. 2014) (citation

omitted). "[E]ach movant must demonstrate that no genuine issue of

material fact exists; if both parties fail to carry their respective burdens,

the court must deny [both] motions. *Quarles v. Palakovich*, 736 F. Supp. 2d

941, 946 (M.D. Pa. 2010) (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d

1007, 1023 (3d Cir. 2008)).

## IV. DISCUSSION

### A. The Defendant's Motion for Summary Judgment

Liberty has moved for summary judgment.

Under ERISA, "benefits determinations arise in many different

contexts and circumstances, and, therefore, the factors to be considered will be varied and case-specific." *Estate of Schwing v. Lilly Heath Plan*, 562 F.3d 522, 526 (3d Cir. 2009) (citing *Glenn*, 554 U.S. at 116–18). For example, "[i]n *Glenn*, factors included procedural concerns about the administrator's decision making process and structural concerns about the conflict of interest inherent in the way the ERISA-governed plan was funded." *Id.* at 526 (citing *Glenn*, 54 U.S. at 118); *see also Engel v. Jefferson Pilot Fin. Ins. Co.*, Civil Action No. 08-240 Erie, 2009 WL 3166513, at *15 n.6 (W.D. Pa. Sept. 28, 2009) (identifying other case-specific factors); *Swiger v. Hartford*, No. 08cv1387, 2009 WL 1248080, at *4 (W.D. Pa. Apr. 30, 2009) (same). "In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Glenn*, 554 U.S. at 117.

In this case, Moncak's challenge to the plan administrator's decision denying benefits boils down to four factors: (1) the conflict of interest inherent in Liberty's dual role as both administrator and payor of long-

term disability claims;[4] (2) whether a non-examining consulting physician retained by Liberty to review Moncak's medical records was subject to an inherent conflict of interest because he was paid by Liberty to perform that review; (3) whether Liberty improperly rejected medical opinions by Moncak's treating physicians in favor of a conflicting medical opinion by a non-examining consulting physician; and (4) whether Liberty reasonably relied upon a vocational skills report prepared by a vocational case manager who never met or spoke with Moncak, and which relied solely on the medical opinion of Dr. Bomar.

### 1. Dual-Role Conflict of Interest

It is undisputed that there is a structural conflict of interest at issue in this case. Liberty "both determines eligibility and then also pays disability benefits." *See Swiger*, 2009 WL 1248080, at *4. The question, however, is how much weight that conflict bears in evaluating whether Liberty abused its discretion in denying disability benefits.

---

[4] This particular issue is only touched upon by the parties in their briefs, with their energies largely focused on whether Dr. Bomar's opinion is tainted by inherent bias and whether Liberty improperly discounted the opinions of Moncak's treating physicians. Nevertheless, we find it necessary to address the structural conflict due to its role in determining the appropriate level of deference to Liberty's exercise of discretion.

Generally, a conflict of interest

> should prove more important (perhaps of great
> importance) where circumstances suggest a higher
> likelihood that it affected the benefits decision, including,
> but not limited to, cases where an insurance company
> administrator has a history of biased claims
> administration. It should prove less important (perhaps
> to the vanishing point) where the administrator has
> taken active steps to reduce potential bias and to promote
> accuracy, for example, by walling off claims
> administrators from those interested in firm finances, or
> by imposing management checks that penalize
> inaccurate decisionmaking irrespective of whom the
> inaccuracy benefits.

*Glenn*, 554 U.S. at 117.

Absent evidence of bias in this or other cases, the inherent conflict that arises when an insurance company plan administrator both determines eligibility and then pays disability benefits is not strong. *See Swiger*, 2009 WL 1248080, at *4. This inherent structural conflict is the only evidence in the record before the Court to support affording any weight at all to Liberty's dual-role conflict of interest, and it is significantly outweighed by unrebutted evidence submitted by Liberty to demonstrate that it "has taken active steps to reduce potential bias and to promote accuracy," including, for example, the separation of its claims administration personnel and its underwriting/premium personnel into

separate divisions located in separate offices in different cities and states from one another, and the active use of management checks to identify and evaluate inaccurate decision-making irrespective of whom the inaccuracy benefits. (Doc. 25 ¶¶ 8–11). *See Glenn*, 554 U.S. at 117.

Accordingly, based on the record before the Court, viewed in the light most favorable to the non-moving plaintiff, we find this Liberty's dual-role conflict of interest should be given little weight in evaluating whether Liberty abused its discretion in its denial of disability benefits under the Policy's "any occupation" period of coverage.

## 2. *Consulting Physician's Inherent Bias or Conflict*

Moncak contends that, as an employee of Liberty, Dr. Bomar is subject to inherent bias or a conflict of interest that influenced him to issue an opinion favorable to Liberty. The unrebutted evidence of record, however, establishes that Dr. Bomar is not an employee of Liberty. Rather, he is a private-practice orthopedic surgeon who has contracted as a consultant to review medical records and provide his medical opinion to Liberty, and that he is paid an hourly rate for his consulting services, based solely on the time worked and not the substance of any opinions he has provided. (Doc. 25 ¶ 7; Doc. 25-1).

Other than the fact that Dr. Bomar is paid an hourly rate to provide his consulting services to Liberty, Moncak has adduced no other evidence of bias or conflict. As our sister court has observed:

> We do not assume that merely because a doctor is paid by the insurance company, he will cast aside his oath to the medical profession, disregard a plaintiff's medical evidence and render judgment in favor of the insurance company because of a financial incentive. Without any evidence to suggest the aforementioned behavior occurred, we do not believe such a[] presumption by the court is warranted.

*Connor v. Sedgwick Claims Mgmt. Servs., Inc.*, 796 F. Supp.2d 568, 589 (D.N.J. 2011). Indeed,

> it would be reasonable to assume that most, if not all, medical consultants and reviewers used by ERISA plan administrators . . . are paid for their services. Unless there is proof of *actual* impropriety, such as reviewers receiving financial incentives to specifically deny or delay claims, the mere fact that reviewers receive payment for their services is not enough to give rise to an inference of conflict.

*Zurawel v. Long Term Disability Plan for Choices Eligible Emps. of Johnson & Johnson*, Civil Action No. 07-5973 (FLW), 2010 WL 3862543, at *12 (D.N.J. Sept. 27, 2010) (citation omitted, emphasis in original); *see also Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 814 (7th Cir. 2006) ("The fact that a plan administrator has compensated physicians for their

consulting services is not, in and of itself, sufficient to establish a conflict of interest . . . . [T]here is no reason to assume independent consultants are not impartial when evaluating medical records."); *O'Conner v. PNC Fin. Servs. Grp., Inc.*, Civil Action No. 15-5051, 2016 WL 2941196, at *7 (E.D. Pa. May 20, 2016) (quoting *Zurawel*); *Connor*, 796 F. Supp. 2d at 589–90 (quoting *Semien* and *Zurawel*). It is also worth noting "the very real possibility that a treating physician may, in a close case, favor a finding for his patient. Thus, without some corroborating evidence of bias, there is no more reason to doubt the veracity of a consulting physician than to doubt the veracity of a treating physician." *Murray v. JELD-WEN, Inc.*, Civil Case No. 3:11-CV-2302, 2013 WL 126323, at *5 (M.D. Pa. Jan. 9, 2013).

Accordingly, based on the record before the Court, viewed in the light most favorable to the non-moving plaintiff, we find that Dr. Bomar's purported bias or conflict due to payment for his consulting services should be given no weight in evaluating whether Liberty abused its discretion in its denial of disability benefits under the Policy's "any occupation" period of coverage.

### 3. Treatment of Medical Evidence

Moncak contends that Liberty unreasonably rejected medical opinions by her treating physicians that she was disabled and unable to work, and improperly credited the opinion of a non-examining consulting physician over that of her treating physicians.

As the Supreme Court of the United States has held, ERISA plan administrators

> may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *see also Klaassen v. Allstate Cafeteria Plan*, 637 F. Supp. 2d 272, 280 (M.D. Pa. 2007).

#### a. Dr. Gillick's Opinion

Dr. Gillick, Moncak's treating orthopedic surgeon, opined that she was unable to work due to constant back pain. He never provided any opinion on Moncak's specific physical limitations. He never pointed to any particular medical findings to support his opinion that she was unable to

work. Meanwhile, in his most recent treatment notes, his objective findings suggest only modest limitations, documenting “a little bit of tenderness,” “some discomfort” with flexion and extension movements, negative straight leg raising, normal motor and sensation in Moncak’s lower extremities, and normal and symmetric reflexes. He characterized the fusion as “nicely healed.” He noted Moncak’s admission that her condition had improved from prior to the operation, and that her pain was “a nuisance.” He noted that “”[t]he etiology of the pain is unclear,” possibly partially caused by the hardware implanted in her spine, but he ordered no x-rays and indicated no need to follow up sooner than six months. Under these circumstances, it was not an abuse of discretion for Liberty to credit the opinion of its consulting physician over that of Dr. Gillick. *See Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 47–48 (3d Cir. 1993) (holding administrator did not abuse its discretion in deferring to the opinions of two consulting physicians over conclusory opinion of treating physician that claimant was “disabled”). Moreover, it was reasonable for Liberty to discount Dr. Gillick’s opinion given that he neither provided an adequate explanation for his opinion nor made a reasonable effort to return phone calls from Dr. Bomar when he sought to discuss Moncak’s

medical condition with him. *See Gibson v. Hartford Life & Accident Ins. Co.*, Civil Action No. 2:06-CV-38144-LDD, 2007 WL 1892486, at *13 (E.D. Pa. June 29, 2007).

b. *Dr. Majernick's Opinion*

Dr. Majernick, Moncak's treating internist, opined that she was unable to work at any job due to constant back pain and due to her use of narcotic pain medication. Dr. Majernick too failed to provide any opinion on Moncak's specific physical limitations. He likewise never pointed to any particular medical findings to support his opinion that she was simply unable to work. As noted by Dr. Bomar in his report, Dr. Majernick's treatment notes repeatedly documented normal or nearly normal gait, normal strength, normal sensation, and normal reflexes. On the telephone with Dr. Bomar, Dr. Majernick referenced Moncak's use of narcotic pain medication. In response, Dr. Bomar noted in his memorandum that Moncak's "use of a mild narcotic such as Vicodin should not prevent regular work duties." Under these circumstances, it was not an abuse of discretion for Liberty to credit the opinion of its consulting physician over that of Dr. Majernick. *See Abnathya*, 2 F.3d at 47–48.

### c. Conclusion

Moncak has argued that Liberty's rejection of medical opinions by treating physicians Dr. Gillick and Dr. Majernick in favor of the conflicting medical opinion by non-examining consulting physician Dr. Bomar constitutes an abuse of discretion. But based on the foregoing, it was reasonable for Liberty to credit the conflicting opinion of Dr. Bomar over Dr. Gillick's and Dr. Majernick's opinions. As a consequence, the treatment of Moncak's treating physicians' medical opinions weighs significantly in favor of Liberty.

### 4. Vocational Skills Report

The plaintiff contends that Liberty unreasonably relied upon the vocational skills report prepared by Jill Brown. An ERISA plan administrator "may reasonably rely on its vocational experts to help it identify alternate occupations, but it is not rational to defer to such experts in the absence of a threshold indication that their conclusions . . . are the product of reliable principles and methods applied reliably to the facts of the case." *Havens v. Continental Cas. Co.*, 186 Fed. App'x 207, 213 (3d Cir. 2006) (internal quotation marks and ellipses omitted). Here, the record contains a detailed vocational skills report noting the several

standard vocational resources relied upon by the vocational case manager, as well as the particular sources of information from Moncak's own file regarding her physical capabilities and her education and work experience. (*See* Doc. 10-4, at 23–25). Moreover, it is clear that she has referenced only Dr. Bomar's 20-pound lifting limitation because that is the only physical limitation identified by any of the medical opinions in the record—Dr. Gillick and Dr. Majernick have opined that Moncak is unable to work, but they have declined to specify any particular limitations in any of their medical opinions, even though the several Restriction Forms they prepared expressly solicit an opinion on exertional limits. Meanwhile, Moncak points us to no evidence in the record that Brown's report is anything other than the "product of reliable principles and methods applied reliably to the facts of the case." While she may disagree with the suitability of the alternate occupations identified, it cannot be said that Liberty was arbitrary or capricious in relying on Brown's vocational skills report.

Accordingly, based on the record before the Court, viewed in the light most favorable to the non-moving plaintiff, we find that the purported unreasonableness or unreliability of Brown's vocational skills report

should be given no weight in evaluating whether Liberty abused its discretion in its denial of disability benefits under the Policy's "any occupation" period of coverage.

### 5. Weighing the Factors

To decide whether Liberty's determination was arbitrary and capricious, the Court must take an accounting of all the case-specific factors and reach a result by weighing all of them together. *See Miller*, 632 F.3d at 855 (citing *Glenn*, 554 U.S. at 117). Here, the factor of Liberty's dual-role conflict of interest is given little weight, as Liberty is responsible for both benefit determinations and payment of benefits, but it has also taken active steps to reduce potential bias and to promote accuracy. The factors of Dr. Bomar's purported bias or conflict due to payment for his consulting services and the purported unreasonableness or unreliability of Brown's vocational skills report are given no weight. Liberty's treatment of medical opinion evidence is given significant weight, as Liberty appears to have reasonably credited the medical opinion of Dr. Bomar over the medical opinions of Dr. Gillick and Dr. Majernick.

In sum, viewing the aggregate evidence in the light most favorable to Moncak, the non-moving party, we find that the disability determination

by Liberty in this case was reasonable and not an abuse of discretion. Accordingly, Liberty's motion for summary judgment will be granted.

### B. The Plaintiff's Motion for Summary Judgment

Moncak has likewise moved for summary judgment.

Based on the foregoing discussion, and viewing the record in the light most favorable to Liberty, the non-moving party, we find that the disability determination by Liberty in this case was reasonable and not an abuse of discretion. Accordingly, Moncak's motion for summary judgment will be denied.

## V.   CONCLUSION

Based on the foregoing, we will grant Liberty's motion for summary judgment (Doc. 17) and deny Moncak's motion for summary judgment (Doc. 20). An appropriate order will follow.

Dated: March 31, 2017          *s/ Joseph F. Saporito, Jr.*
                               JOSEPH F. SAPORITO, JR.
                               United States Magistrate Judge